Argued June 17, affirmed July 1, petition for rehearing denied, opinion corrected October 14, 1959

BUCKLER *v.* HOOD RIVER COUNTY

341 P. 2d 555

J. R. *Latourette* argued the cause for appellant. On the brief were Latourette & Latourette, Portland.

*Gunther F. Krause*, Portland, argued the cause for respondent. With him on the brief was Kenneth M. Abraham, Portland.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal by plaintiff from a judgment rendered by the Circuit Court of Multnomah County, in favor of the defendant, in a law action where the trial was before the court, both parties having waived the right to a jury. Plaintiff, who was the general contractor for the construction of the new Hood River County courthouse, but who was not required by the original contract, except with regard to the footings, to do the excavation work for the basement of said building, is seeking to recover on an admitted supplemental contract providing for the excavation last mentioned and compensation therefor based upon different rates of pay for different classes of excavation.

The supplemental contract provided for a lump sum

price for "ordinary excavation," fixed a price for removal of other material and then provided as follows:

> "Any rock excavated of ½ c.y. content and larger will be considered as rock excavation and our bid for this will be at the unit price of $31.50 per c.y. *Any hardpan excavated that cannot be excavated with a ¾ yard back-hoe or shovel will be considered as rock excavation, and at the same unit price.*" (Emphasis ours).

Plaintiff claims that in performance of this agreement it excavated 1,955 cubic yards of hardpan at $31.50 per cubic yard for which it should be paid $61,582.50, and in addition excavated 350 cubic yards of rock along State Street for which, at $31.50 per cubic yard, it should be paid $11,025.00. As to the last item, it appears in fact that this was for hardpan although it was designated in the complaint as "rock." Plaintiff says there is no variance because by the contract "hardpan" is to be considered as "rock." We will, for the purpose of this opinion, assume that plaintiff is correct. However, it should be noted that during the trial plaintiff was not permitted on its own motion to amend its complaint so as to designate "hardpan" rather than "rock" with relation to this item although its evidence on that account was not excluded. Since there is no real dispute as to the quantity of material that was actually removed, the basic issue of this case has to do with whether the material so removed shall be classified as "common excavation" or under the designation of "hardpan" that "cannot be excavated with a ¾ yard back-hoe or shovel." The trial court found that the material was not rock hardpan, hardpan or rock, but must be classified as "ordinary excavation." Plaintiff claimed compensation for other items, but has abandoned such claims on this appeal.

As its first assignment of error, plaintiff contends that the court erred in finding that the material in question was not hardpan and in failing to find, as requested by plaintiff, that such material was hardpan that could not be excavated by a ¾-yard shovel or backhoe.

■ In an action at law, where the verdict of a jury is not involved, the appellate court will not on appeal try the case de novo but will determine whether there is substantial evidence to support the judgment, treating the court's findings of fact as equivalent to a verdict. See *In re Wakefield's Estate*, 161 Or 330, 336, 87 P2d 794, 89 P2d 592. It, therefore, becomes necessary to review the evidence. In that connection there was a wide divergence of opinion as to whether the material in question was hardpan. There was basically very little difference of opinion as to what constitutes hardpan, although there was considerable variation of opinion as to the origin. A number of defendant's witnesses thought it came about through glacial deposits. The term was defined in various ways, but the great majority of the witnesses conceded, if not directly at least in effect, that it was material that was cemented together. Bert M. Butler, subcontractor and a witness for plaintiff, stated, "We call it hardpan or cemented rock." Elmer G. Harrington, defendant's architect, defined it as materials that "became cemented together." Hilbert Hansen, who was general superintendent for plaintiff, defined it as "cemented rock or hardpan or whatever you want to call it." D. L. Conner, chief engineer for plaintiff, gave a very liberal interpretation in favor of his employer when he defined it as "any material that can't be removed by ordinary means," and on cross-examination thought that if, at one pass with a backhoe, the operator was unable to fill his bucket,

the material would come within the definition. Mart C. Perkins, an engineer who was Clerk of the Works, described it as "a material that has been cemented together under pressure." Arthur M. James, a consulting engineer who was experienced in the study of foundations for buildings, term it "a cementitious material which is the essence of hardpan."

Various definitions are set forth in plaintiff's brief as follows:

"Webster defines it as:

'Hard pan: Chiefly U.S.1. Any earth not popularly recognized as rock, through which it is hard to dig or to make excavations of any sort. It may be: (1) semi-indurated clay with or without admixture of stony matter; (2) cemented gravel; or (3) clay, with or without admixture of stony matter, which is very tough because of strong cohesion. (2) Hard, unbroken ground.'"

"H. H. Siegeler's Building Trades Dictionary defines it thus:

'Hardpan: firm, underlying stratum of ground united with sharp sand, which makes a good base for foundations.'"

"Funk & Wagnall's:

'Hardpan, a layer of firm detritus under soft sand.'"

"Detritus is defined as 'loose fragments or particles of rock.'"

"Merriam & Wiggins Handbook:

'Hardpan is a rather loosely used term, but is mostly applied to very dense heterogeneous mass of clay, sand and gravel of glacial drift origin; it is also applied to the hard stratum of consolidated soil underlying the surface soil.'"

In any event, as used in the building trades, it clearly appears from the testimony of most of the wit-

nesses on both sides that hardpan is a material that is cemented together for one reason or another so as to form a firm mass of material.

■ Plaintiff contends that the definitions of "hardpan" given by the expert witnesses were too restricted and at variance with the terms used by the parties, and, since they were based upon a false premise, their conclusions are without any probative value and that, in any event, it was the duty of the court to construe the contract and determine the ultimate fact. We have already called attention to the fact that there was substantial agreement here as to what such term means in the construction trade. Further, it appears that the definitions so given were not necessarily at variance with the definitions quoted by plaintiff. This is not a case where the expert witnesses were solely answering hypothetical questions, but were testifying as to their opinions, based upon personal observations on the ground, viewed in the light of their experience. Evidence, in any event, is admissible to show that the terms of a written contract have a technical or peculiar trade significance. ORS 42.250. We agree that it was the duty of the court to construe the contract, but in doing so it had a right to consider the testimony of expert witnesses as to the meaning of the term "hardpan" and from that determine the ultimate fact, which was done in this case.

■ While the testimony was conflicting, there was ample evidence submitted on behalf of defendant that the material mentioned was not hardpan and that it could have been removed with a backhoe or shovel. Mr. Harrington, defendant's architect, testified as follows:

"A Well, we ran into rock in that area where the tank went in.

"Q That rock would be part of the hardpan, wouldn't it?

"A No, there is a difference between rock and hardpan. He actually did not hit any hardpan in the entire project.

"Q How is that?

"A We didn't hit any hardpan in the entire project.

"Q Most of it under the Courthouse?

"A It is a conglomerate. It is rock and sand. You can go in with your fingers and take it out and also a firehose would remove it very nicely.

"Q You mean all of that that you call hardpan?

"A We don't call it hardpan. A hardpan is a composite, hard substance material that you have to blast or break up to remove. That wasn't the type.

"Q Well, what did they use the ripper for?

"A We are the architects on the project. We are the architects, we never tell the contractor what method to use or the method of machinery to use. He is to use his own judgment to the best of his knowledge and we want to see the accomplished project, the basement dug and the building constructed. If I were to tell him what material or equipment to use and we were wrong he could have libel against me.

\* \* \*

"Q Now, was it material that could be excavated with the back hoe?

"A It could be, yes.

"Q And did you actually see this material that was called hardpan excavated with the back hoe?

"A Yes, I did.

"Q Now, the back hoe has been described here as a bucket with teeth on it that is drawn toward the diesel engine on a boom and there was testimony here to the effect that they had to make a num-

ber of passes with the back hoe in order to get a bucket full. Did you observe that yourself on any occasion?

"A I would say that I have seen the back hoe make one or two passes trying to get the bucket full. Get the material up.

"Q Is that an uncommon thing with common excavation that the back hoe has to make more than one pass or several passes?

"A No.

"Q To get a load?
"A No, that is quite common in any excavation."

G. M. Paterson, general manager for plaintiff, on cross-examination, testified that a ripper was used, but also testified as follows:

"Q All right, now let's see, did you ever write the architects that all of this 1,955 yards was removed with a back hoe and no mention of any other equipment being used?

"A It was removed by the means of a back hoe at four, five and six passes.

"Q All right, it took four or five or six passes to get a shovel full?
"A A dipper full, yes.

"Q But it was removed with a back hoe, is that right?
"A Not in the sense that you would remove common excavation."

Mr. Perkins, previously referred to, who was intermittently present during the excavation, stated that there was no cementing material and that he did not see any material which could not be excavated with a backhoe. George M. Jacobson, called as a witness for defendant, but who was a foreman on the job for plaintiff during the excavation, testified that the material was not hardpan as he understood it. Mr. James, con-

sulting engineer, who made a routine investigation of the material for the purpose of testifying, testified it could have been removed with a 3/4-yard backhoe without blasting, although he though light blasting would make the material easier to remove. Francis E. Honey, a consulting engineer and a partner of Mr. James, and who made an inspection of the material, testified it was not hardpan and could be removed with a 3/4-yard backhoe.

The fact remains that the item of 1,955 cubic yards was removed by a 3/4-yard backhoe, although there are indications that a device called a ripper was also used. It also appears that the contractor, in removing the additional 350 cubic yards along State Street for which claim is made, did do some blasting after preparation with a jackhammer and compressor. If defendant's testimony is to be believed, all this material could have been removed with a backhoe, although plaintiff's testimony is to the contrary. In any event, there was substantial evidence submitted in support of defendant's contention.

■ But, in addition, plaintiff argues in effect that, even assuming the material in question was not hardpan and even assuming that the material could in fact be removed with a backhoe, it was not economically feasible or reasonable to do so and, therefore, the court, in considering the contract, should construe it to apply to "any hardpan that cannot *reasonably* be excavated with a 3/4 yard back hoe or shovel." Defendant further argues that the definition of hardpan is of little significance here, since the contract by its very terms defines it as material that cannot be excavated with a 3/4-yard backhoe or shovel. With the exception that the material must be shown to be hardpan, we agree. We

do not, however, agree with plaintiff's contention that, in construing the contract definition, we should enlarge the term "excavated" by defining it to mean "reasonably excavated." In support of this contention, plaintiff cites *Baker v. Multnomah County*, 118 Or 143, 246 P 352. In that case, as in this, a construction contract was involved having to do with the removal of classified material at varying prices. In that case, common excavation was defined by contract as material that "can be plowed with a good six-horse team." The opinion of this court by the Honorable HENRY J. BEAN, in effect, construed the term to mean material "that can *reasonably* be plowed with a good six-horse team." We think the construction is subject to criticism. In the first place, it was unnecessary to so construe it. In the second place, it is an obvious example of the court attempting to introduce additional provisions into the contract.

■ Defendant further cites *Indianapolis Northern Traction Co. v. Brennan*, 174 Ind 1, 87 NE 215, 227, 228, which involved classification of materials under a construction contract. In that case, the test related to material "which in the judgment of the chief engineer it is impracticable to plow at all with a strong ten-inch grading plow, well handled, and driven by six good mule or horse team." In that case, it was said that under the terms of the contract plowing meant "plowing with reasonable facility" and not a mere "rooting up" of the material. However, in applying the test to the facts, the court said that "what appellee did in this respect could not be said to be plowing, but merely in common parlance 'rooting out.'" It is to be noted that one of the tests provided by this contract involved practicability. In any event, that portion of the case was determined on a finding that the material

was not, in fact, plowed. In *Sweeney v. Jackson County*, 93 Or 96, 131, 132, 178 P 365, 182 P 380, involving road construction, and cited in *Baker et al. v. Multnomah County*, supra, hardpan was defined as including "material, not loose, or solid rock, that cannot, in the opinion of the engineer, be reasonably plowed, on account of its own inherent hardness." It was contended that adobe encountered, under the contract definition, constituted hardpan. On the basis of *Indianapolis Northern Traction Co. v. Brennan*, supra, cited therein, it was held that the material could not reasonably be plowed because it could not be successfully blasted or plowed, "but to use the description given it had to be 'dug out' as best it could be." In other words, the court readily found that the material could not, in fact, be plowed at all. We find no fault with the ultimate decisions of these cases, but wish to point out that the introduction of the term "reasonably" by the court adds nothing thereto by way of a practical test, unless it be construed to mean that the men charged with decision must be reasonable in applying it. In any event, we do not intend to follow that practice here. This court has no authority to read into a contract a provision which does not appear therein, nor to read out of it any portion thereof. *City of Reedsport v. Hubbard*, 202 Or 370, 386, 274 P2d 248.

In any event, there was evidence in this case that the material in question could reasonably be moved with a backhoe, although a portion of it could be characterized as "hard going." As to that portion, it may have been economically feasible to use blasting, but defendant's evidence indicates that it was not necessary to do so. It appears that as the excavation became deeper, the materials, because of pressure, became more compacted. Defendant's evidence, however,

indicated no cementing and that the material could be loosened by the fingers.

Upon completion of the excavation, plaintiff billed defendant for excavation of 1,955 cubic yards of hardpan at $7.50 per yard, having already been paid on account $1.50 per cubic yard. If plaintiff was correct in its contentions, it would have been entitled to $31.50 per cubic yard, or more than three times the amount there claimed. That portion of plaintiff's letter [Exhibit 3] submitted to defendant at the time, explaining the basis for the claim, reads in part as follows:

"In our proposal of July 16th, you will note that we have not quoted any cost for the removal of hardpan. The hardpan encountered on the above subject job could readily be interpreted to be rock excavation at the agreed unit price of $31.50 per c.y., in that even though a ¾-yard shovel had dug it under very difficult circumstances, making five or six passes before filling the dipper.

"On this basis we do no feel justified in billing the Hood River County the unit price for rock excavation and are appealing to you, as the architect, for a reduced unit price for hardpan on the basis of $9.00 per c.y. less $1.50 per c.y. credit for common excavation, or a net unit price of $7.50 per c.y. for hardpan excavation.

"We wish to inform you that the actual excavation of the hardpan has cost the George H. Buckler Co. $9.02 per c.y., of which we are waving [sic] the two cents to make the figure come out in even dollars."

This letter is significant and, along with the other testimony, constitutes substantial evidence in support of defendant's case on the basic issue of liability. While this case was brief and argued by both sides as though it were being tried de novo, we reiterate that

such is not the case and that our duty lies in determining whether there is substantial evidence to support the findings and consequent judgment. We answer in the affirmative and, hence, find that the first assignment of error is without merit.

Plaintiff's second and third assignments of error have to do with the court's failure to make special findings requested with regard to the type of material encountered as to both items claimed. Such proposals would have required the trial court to find that the material was "cemented or compacted layer of gravel, sand and such" and that it was "necessary to loosen it by blasting" or, with respect to the 1,955 cubic yards, "by blasting or by a ripper or other means." We have already pointed out that there was substantial evidence that the material was not cemented and that it could have been removed with a backhoe even though blasting might have facilitated the work. We, therefore, find these assignments without merit.

The fourth and fifth assignments of error have to do with the court's findings as to payment and as to certain facts having to do with accord and satisfaction. There is no question but that plaintiff was fully paid on the basis of "common excavation." These questions have to do with defendant's claims in excess of such payment. Since the issue of liability must be determined adversely to defendant's contention, it would not serve any purpose to discuss these further assignments and, hence, for that reason they are now deemed without merit. Hence, the judgment of the trial court must be affirmed.